UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
NORTHERN DIVISION
ASHLAND

Civil Action No. 17-7-HRW

DANNY RAY HENSLEY,
*Administrator of the Estate of Danny Oscar Hensley*,   PLAINTIFF,

v.   **MEMORANDUM OPINION AND ORDER**

HEATHER BOSSIO, *et al*,   DEFENDANTS.

Winston Churchill observed, "[t]he mood and temper of the public in regard to the treatment of crime and criminals is one of the most unfailing tests of the civilizations of any country." [1]   America's prison population exceeds two million. [2]   Overcrowding, understaffing and bureaucratic nonsense are the hallmarks of a prison system where violence and abuse run rampant. To be sure, "nobody promised [inmates] a rose garden." *Atiyeh v. Capps*, 449 U.S. 1312, 1315 (1981). "[T]he Constitution does not mandate comfortable prisons, and prisons ... cannot be free of discomfort." *Rhodes v. Chapman*, 452 U.S. 337, 349 (1981). However, the maladies within the prison system manifest themselves in violence, exploitation, rape and murder with what appears to be increasing frequency. In this test, our nation is faltering.

Danny Oscar Hensley died while he was incarcerated at the Little Sandy Correctional Complex ("LSCC"). At the time of his death, he was twenty-three years old and a mere seven months from being released from prison. Danny Hensley was beaten, possibly raped and

---

[1] House of Common speech, given as Home Secretary, July 20, 1910.

[2] United States Bureau of Justice Statistics (2017).

strangled to death by another inmate, Randy Bowman.

At the time of Hensley's murder, Heather Bossio was a Classification and Treatment Officer at LSCC and Holly Finch was a supervisor at LSCC. [Docket No. 25, Amended Complaint, ¶¶ 4-5].

Plaintiff, Hensley's father and the Administrator of his Estate, contend that prison officials, including Bossio and Finch, failed to protect his son and that their failure resulted in his death. *Id.* at ¶ 1.

Before the Court is the Defendants Heather Bossio and Holly Finch's Motion for Summary Judgment [Docket No. 19]. The matter has been fully briefed by the parties [Docket Nos. 19-1, 20 and 21]. For the reasons set forth herein, the Court finds that neither Defendant is entitled to qualified immunity and, therefore, their motion will be overruled.

## I.    FACTUAL BACKGROUND

The facts alleged in the Amended Complaint are as follows: On June 30, 2016, Randy Bowman murdered Hensley. *Id.* at ¶ 27. At that time, they were housed in the same dorm at LSCC. *Id.* at ¶ 36. Earlier on that day, Hensley and Bowman went to Defendant Bossio's office to follow up on a request to be cellmates. In her role as a Classification and Treatment Officer, she was responsible for classifying inmates based upon various risk factors which may guide the determination of where the inmates are housed. *Id.* at ¶ 4

In seeking a change in Hensley's cell assignment, Bowman and Hensley explained to Bossio that other inmates had harassed Hensley when he lived in a different dorm. Hensley stated that he felt "safer" in his current dorm. Bossio denied the request, explaining that because Bowman was a "high risk abuser," and Hensley was a "high risk victim," they would not be

2

housed together. Bossio advised Bowman and Hensley, however, that they could "spend time together." *Id.* at ¶¶ 39-41.

Before the murder, Bowman and Hensley entered Bowman's cell on the second floor of the dorm. *Id.* at ¶ 43. According to the Amended Complaint, a corrections officer, named as "John Doe 1", was approached by Bowman and Hensley before they entered Bowman's cell and that either Bowman or Hensley said something to the corrections officer. *Id.*

After Hensley and Bowman entered Bowman's cell, one of them placed a towel over most of the cell door window. The cells in this dorm at LSCC have full doors. The doors have a tall, narrow window, which is the only way for prison officials to look into the cell. *Id.* at ¶¶ 45-46.

After one of them covered the cell door window, Bowman and Hensley engaged or attempted to engage in sexual intercourse. *Id.* at ¶ 50. At some point while they were in Bowman's cell, Bowman physically assaulted Hensley. He caused numerous cuts to Hensley's head and face, and ultimately, Bowman strangled him. *Id.* at ¶ 53.

Video surveillance shows that he exited and entered his cell multiple times, after the assault. *Id.* at ¶ 67. According to the Amended Complaint, Bowman's shirt was visibly stained with Hensley's blood. *Id.* at ¶ 68.

Eventually, Bowman told Defendant Derek Maggard, another corrections officer, that an inmate was dead in his cell. In response, Maggard and another corrections officer, Defendant Andrew Hayes, went to Bowman's cell. *Id.* at ¶ 70. When Maggard and Hayes arrived at the cell, the towel still covered much of the cell door window. *Id.* at ¶ 71. Hayes looked over the towel and saw Hensley, lying naked, face down on the cell floor. *Id.* at ¶ 72. Hayes checked

3

Hensley's pulse, but found none. *Id.* at ¶ 73. Officers transported Hensley to St. Clair Regional Medical Center, where he was pronounced dead. *Id.* at ¶ 74.

The Amended Complaint alleges that certain policies existed at this time at LSCC, prohibiting inmates from entering the cells of enter inmates, covering the cell windows, engaging in sexual intercourse with another inmate and assaulting another inmate. *Id.* at ¶¶ 44, 47, 51 and 52. Defendants do not dispute the existence of these policies.

Video surveillance shows that after Bowman and Hensley entered Bowman's cell, and after one of them covered most of the cell door window with a towel, a corrections officer, named in the Amended Complaint as "John Doe 2" walked the entirety of the dorm's second floor. *Id.* at ¶ 55. He walked past each cell, and looked through each cell window. *Id.* When Defendant Doe 2 approached Bowman's cell, with the towel covering the cell door window, he looked over the top of the towel into the cell. *Id.* at ¶ 56. Despite LSCC's policy against covering cell door windows, Defendant Doe 2 did not enter Bowman's cell. *Id.* at ¶ 57.

According to the Amended Complaint, LSCC officials determined, pursuant to the Prison Rape Elimination Act[3], that Hensley was at a high risk of being sexually victimized by other

---

[3] 42 U.S.C. § 15601, *et seq.* (2003). The purpose of the PREA is to provide for the "analysis of the incidence and effects of prison rape in Federal, State and local institutions, and for information, resources, recommendations and funding to protect individuals from prison rape." The PREA accomplishes many objectives, including: presenting congressional findings on the incidence and societal consequences of prison rape; mandating the U.S. DOJ to collect statistical information on the incidence of prison rape; providing grants to aid states in creating solutions to the problem; establishing a national commission to further study the prevalence, causes and effects of prison rape; and directing the United States Attorney General to issue a rule to address and eliminate the problem of prison rape. Press Release, United States President George W. Bush, Statement on Prison Rape Elimination Act (Sept. 4, 2003), http://www.whitehouse.gov/news/releases/2003/09/20030904-9.html.

inmates. *Id.* at ¶ 29. On numerous occasions while he was incarcerated he requested protective custody and stated he was afraid of other prisoners, but later recanted his statements and refused protective custody. *Id.* at ¶ 30. On more than one occasion, he told prison officials he had suicidal thoughts. *Id.* at ¶ 31.

LSCC officials determined, pursuant to the Prison Rape Elimination Act, that Bowman was at a high risk of sexually abusing other prisoners. *Id.* at ¶ 33. On numerous occasions, prison officials disciplined Bowman for threatening other inmates and prison employees. *Id.* at ¶ 34. At the time he murdered Hensley, Bowman was 63 years old. He was serving a 45-year sentence for murdering a person with whom he was incarcerated. *Id.* at ¶ 32.

On November 28, 2016, Bowman plead guilty to the murder of Hensley and was sentenced to life in prison without the possibility of parole. *Commonwealth of Kentucky v. Bowman,* 16-CR-00037, Elliot County Circuit Court.

## II. PROCEDURAL HISTORY

Danny Ray Hensley, Hensley's father, filed this action against Defendants Heather Bossio and Holly Finch, in their individual capacities, as well as four John Does. [Docket No. 1].

The Complaint was subsequently amended, upon Plaintiff's motion, to add additional Defendants who were on duty at LSCC on the day of Hensley's murder. [Docket Nos. 22 and 25].

Plaintiff alleges that the Defendants violated Hensley's Eighth Amendment rights through deliberate indifference to a substantial risk of serious harm to Hensley, or in the alternative that they made an intentional decision to place Hensley at a substantial risk of suffering serious harm. Plaintiff also alleges that Defendant Finch is liable for Bossio's alleged violations of Hensley's

5

rights through supervisory liability. Finally, Plaintiff alleges that Defendants are liable in tort for Hensley's death.

Defendants Bossio and Finch seek summary judgment, arguing that they are entitled to qualified immunity.

## III. STANDARD OF REVIEW

Defendants' motion is styled as one for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. In their motion, however, Defendants refer to Rule 12(b)(6), the rule governing motions to dismiss. Perhaps seizing upon this language, Plaintiff argues that the standard of review is that of Rule 12(b)(6), an admittedly more forgiving standard that that of Rule 56. However, the inclusion of an affidavit by Bossio, as well as other documents, render Defendants' motion to be for summary judgment and, therefore, Rule 56 applies.

A motion for summary judgment under Federal Rule Civil Procedure 56 presumes the absence of a genuine issue of material fact for trial. The court must view the evidence and draw all reasonable inferences in favor of the non-moving party, and determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-252 (1986).

A fact is "material" if its resolution affects the outcome of the lawsuit. *Lenning v. Commercial Union Ins. Co.*, 260 F.3d 574, 581 (6th Cir.2001). "Materiality" is determined by the substantive law claim. *Boyd v. Baeppler*, 215 F.3d 594, 599 (6th Cir.2000). An issue is "genuine" if a "reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

6

The party bringing the summary judgment motion has the initial burden of informing the district court of the basis for its motion and identifying portions of the record which demonstrate the absence of a genuine dispute over material facts. *Mt. Lebanon Pers. Care Home, Inc. v. Hoover Universal, Inc.*, 276 F.3d 845, 848 (6th Cir.2002).

The party opposing the motion then may not "rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact" but must make an affirmative showing with proper evidence in order to defeat the motion. *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir.1989). A party opposing a motion for summary judgment must designate specific facts in affidavits, depositions, or other factual material showing "evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252, 106 S.Ct. 2505. If the non-moving party, after sufficient opportunity for discovery, is unable to meet his or her burden of proof, summary judgment is clearly proper. *Celotex Corp.*, 477 U.S. at 322–23, 106 S.Ct. 2548; *Napier v. Madison County, Ky.*, 238 F.3d 739, 741–42 (6th Cir.2001).

## IV. QUALIFIED IMMUNITY

Defendants Bossio and Finch claim that they are entitled to judgment as a matter of law on the basis of qualified immunity because the undisputed facts do not demonstrate a violation of Hensley's Eighth Amendment Rights.

The affirmative defense of qualified immunity shields "government officials performing discretionary functions ... from liability for civil damages insofar as their conduct does not violate 'clearly established' statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Thus, a corrections officer may

be entitled to qualified immunity from suit even if he actually violated the plaintiff's constitutional rights, because "reasonable mistakes can be made as to the legal constraints on particular [official] conduct." *Saucier v. Katz*, 533 U.S. 194, 205, 121 (2001).

To determine if qualified immunity attaches, this Court employs the sequential analysis prescribed by the Supreme Court in *Saucier*. *See Greene v. Barber*, 310 F.3d 889, 894 (6th Cir.2002). First, the Court must determine whether, based upon the applicable law, the facts viewed in the light most favorable to the plaintiff show that a constitutional violation has occurred. *Dean v. Byerley*, 354 F.3d 540, 557 (6th Cir.2004); *see also Saucier*, 533 U.S. at 201 ("If no constitutional right would have been violated were the allegations [in the complaint] established, there is no necessity for further inquiries concerning qualified immunity."). Second, the court considers whether the violation involved a clearly established constitutional right of which a reasonable person would have known. *Dean*, 354 F.3d at 557. Third, the court determines whether the plaintiff has offered sufficient evidence to indicate that what the official allegedly did was objectively unreasonable in light of the clearly established constitutional rights. *Id.*

Although the policy of the Sixth Circuit is to resolve immunity questions at the earliest possible stage of the litigation, "[s]ummary judgment is not appropriate if there is a genuine factual dispute relating to whether [the defendant] committed acts that allegedly violated clearly established rights." *Flagner v. Wilkinson*, 241 F.3d 475, 481 (6th Cir.), cert. denied, 534 U.S. 1071, 122 S.Ct. 678, 151 L.Ed.2d 590 (2001).

The Court must first determine whether a constitutional violation occurred, that is, taking the facts in the light most favorable to the plaintiff, the defendant may be held liable for subjecting Hensley to cruel and unusual punishment as proscribed by the Eighth Amendment.

The Eighth Amendment forbids government officials from inflicting "cruel and unusual punishments" on criminal defendants. The Supreme Court has interpreted this language to provide a means for prisoners to challenge their conditions of confinement while in custody, including the adequacy of their food or the temperature of their cells. *See Wilson v. Seiter*, 501 U.S. 294, 304 (listing basic human needs which could give rise to Eighth Amendment liability). The Eighth Amendment extends further, charging prison officials with a duty to protect prison inmates under their supervision from intentional violence visited upon them by other inmates. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). In doing so, the Court observed, "[p]rison conditions may be 'restrictive and even harsh,' but gratuitously allowing the beating or rape of one prisoner by another serves no 'legitimate penological objective' ". *Id.* at 833 (internal citations omitted).

To succeed in proving an violation of the Eighth Amendment in this context, a plaintiff must show: "(1) the deprivation alleged is objectively 'sufficiently serious,' and (2) the prison official had a sufficiently culpable state of mind." *Id.* at 834. "A sufficiently culpable state of mind is one of 'deliberate indifference' to inmate health and safety." *Id.* In defining deliberate indifference, the Supreme Court held:

> [A] prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be

9

> aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.

*Id.* at 837; *see also Thaddeus–X v. Blatter,* 175 F.3d 378, 402 (6th Cir. 1999).

The test for deliberate indifference contains both a subjective and an objective component. *Farmer,* 511 U.S. at 837–38, 114 S.Ct. 1970. The objective component of the analysis is an inquiry into the type of harm that the prison allegedly failed to deter. The subjective component looks to the prison official's state of mind. *Bishop,* 636 F.3d 757, 766 (6th Cir. 2011).

To defeat the Defendants' motion for summary judgment, Plaintiff must raise an issue of fact as to their knowledge of a risk to his son's safety while he was incarcerated at LSCC and their deliberate indifference to it.

## V. ANALYSIS

Undertaking the analysis of the objective element set forth in *Farmer,* it is plain that the harm caused to the Hensley was sufficiently serious. Hensley was murdered. Indeed, Defendants concede that the deprivation of life is more than "sufficiently serious."

However, as to the subjective component, Defendants vehemently object. They argue that Plaintiff has not and cannot demonstrate that either Defendant possessed the requisite mental state. They deny having any knowledge that Bowman posed a threat to Hensley and that none of Hensley's requests for protective custody, although ultimately recanted, pertain to any threats made by Bowman to him.

10

They further contend that even if they had known of Hensley's prior suicidal thoughts, which the deny, that knowledge is not relevant to whether Bowman posed a risk of harm to Hensley.

Their dispositive motion includes an Affidavit by Heather Bossio, in which she flatly denies all the allegations made against her and further asserts that although she interviews inmates upon their arrival at LSCC, completes the standard Prison Rape Elimination Act Risk Assessment Form and assigns a "suggested risk level," she does not determine the final risk level or have the authority to make any decisions regarding inmate housing. [Affidavit of Heather Bossio, Docket No. 19-6, ¶¶ 4 and 6]. She further states that she does have access to the PREA investigations or inmates' medical record. *Id.* at ¶¶ 5 and 7].

However, Defendants strident arguments do not adequately dispute the facts alleged in the Amended Complaint. When Hensley and Bowman met with her, on the day of Hensley's murder, to request to be placed in the same cell, Bossio explained that their request would be denied because the Prison Rape Elimination Act classification system identified Bowman as a "high risk abuser" and Hensley as "high risk victim," implying that placing them together would run afoul the classification system. Based upon these alleged facts, Bossio was certainly aware of their respective risk classification. As the officer who interviews each inmate upon their arrival, she was presumably aware that Bowman was serving time for murdering a fellow inmate. Yet, despite this knowledge, she told them they could "spend time together" and did not take any other action or follow up.

The risk classifications alone, which are clearly within Bossio's bailiwick, provide facts from which the inference could be drawn that a substantial risk of serious harm existed. Her discussion with Bowman and Hensley on the day of Hensley's murder shows that she did, in fact, draw the inference, because she denied their request to share a cell. Under *Farmer*, this is sufficient to withstand a motion for summary judgment based upon qualified immunity.

As for Defendants assertion that they did not have any information that Bowman was a threat to Hensley, specifically, under *Farmer*, it is not necessary that a prison official draw the inference of a **specific** risk to a **specific** inmate to defeat a claim of qualified immunity. In *Farmer*, the Supreme Court pointed out that a prison official may not escape liability for deliberate indifference by showing that "he [or she] did know that the complainant was especially likely to be assaulted by the specific prisoner who eventually committed the assault. *Farmer*, 511 U.S. at 843. "[I]t does not matter whether the risk comes from a single source or multiple sources, any more than it matters whether a prisoner faces an excessive risk of attack for reasons personal to him or because all prisoners in his situation face such a risk." *Id. See also Taylor v. Michigan Depart of Corrections*, 69 F.3d 76, 81 (6th Cir. 1995) (rejecting defendant's argument that he could not be liable because he had no personal knowledge of plaintiff's particular vulnerabilities to sexual assault because "*Farmer* makes it clear that the correct inquiry is whether [an official] had knowledge about the substantial risk of serious harm to a particular class of persons, not whether he knew who the particular victim turned out to be").

Plaintiff is not required to show prison officials drew the inferences both of a generalized risk to the plaintiff and a hyper-specific risk from a particular person. *Farmer* and its progeny establish that a prison officials' Eighth Amendment duty to protect arises when they draw the

12

inference of a risk of serious harm to a prisoner or class of prisoners. Therefore, Defendants argument that they were not aware of a risk to Hensley specifically does nothing to help their cause.

Finally, Defendants suggest that even though Hensley had sought protective custody at various times during his incarcerations, those requests were recanted and none of the requests identified Bowman as the reason Hensley as seeking protective custody. However, these facts do not absolve Defendants. In *Farmer,* prison officials housed a transgender female prisoner in general population at a higher security facility with male prisoners. *Farmer, 511 U.S. at 829-830.* The transgender prisoner wore women's clothing, had silicone breast implants, and "project[ed] feminine characteristics." *Id.* at 829. She voiced no objection to any prison official about the transfer to the higher security facility or to placement in general population. *Id.* at 830. Ultimately, she was beaten and raped in her cell by another prisoner. *Id.* The Court stated that it was not dispositive that the transgender prisoner did not express concern for her safety. *Id.* at 848. Instead, the Court held that relevant factor was prison officials' awareness of the risk, as shown by any relevant evidence. *Id.* The Court determined the officials were not entitled to qualified immunity because they were subjectively aware of the risk to the transgender prisoner, not only because of her youth and feminine appearance but, because one prison official admitted she was at high risk of physical or sexual assault. *Id.* The official's statement was enough to show he was aware of facts from which the inference could be drawn that she was at risk of serious harm, and he drew the inference.

As in *Farmer,* in this case, notwithstanding the age difference between Hensley and Oscar, the facts that Bossio admitted she knew Hensley was classified as a high risk victim establishes, under *Farmer*, that she drew the requisite inference.

In this case, Plaintiff has alleged facts sufficient to support an inference that Defendants were aware of a substantial risk of serious harm. Hensley was vulnerable. He had been classified as a high risk victim and was housed with, and told to "spend time with" a high risk abuser. Not only did Defendants fail to act upon these facts but, further, neglected to intervene, in contravention of their own policies, when Hensley and Bowman entered Bowman's cell, one of them covered the cell window, and Bowman later emerged from the cell with blood on his shirt. Not only were correction officers in the halls of the dorm during Hensley's assault and murder, but, according to the Amended Complaint, the area was under video surveillance. Yet, Hensley was brutally assaulted and killed under their collective noses.

At a minimum, there are factual issues as to whether Defendants knew of the risk Hensley's safety.

Defendant Finch also argues that she cannot be held liable for the acts or omissions of Bossio on a theory of supervisory liability because she is not Bossio's supervisor. While that may be true, there is enough in the record at this time to keep Finch in the case based upon her own acts or omissions. She dos not dispute that as a supervisor at LSCC, part of her duties include classifying inmates. As discovery has not concluded, it is not for the court to speculate what facts will come to light as to Finch's knowledge of the events given rise to this lawsuit.

Interestingly, Bossio filed an Affidavit seeking to support her motion for judgment as a matter if law. However, it is her Affidavit, and her denial of all the allegations against her, that created the factual issues which preclude summary judgment.

## VI. CONCLUSION

Nelson Mandela remarked, "[i]t is said that no one truly knows a nation until one has been inside its jails. A nation should not be judged by how it treats its highest citizens, but its lowest ones ...." [4] Not every injury suffered by one prisoner at the hands of another translates into constitutional liability for the prison officials responsible for the inmates' safety. However, in this instance, viewing the facts in the light most favorable to Plaintiff, issues of fact remain as to whether Defendants had the requisite knowledge of a substantial risk of harm. Therefore, summary judgment is not appropriate.

Accordingly, **IT IS HEREBY ORDERED** that Defendants Heather Bossio and Holly Finch's Motion for Summary Judgment [Docket No. 19] be **OVERRULED**.

This 9th day of March, 2018.



**Signed By:**
*Henry R. Wilhoit, Jr.*
**United States District Judge**

---

[4] *A Long Walk to Freedom*, Nelson Mandela, pp. 174-175 (1994).